case under submission. I'll call the next case, but certainly you all have time to get set up. U.S. v. Kachkar. We have Mr. Adler for the appellant and Mr. Lieberman for the government. Mr. Adler, once you get settled and you're ready, please proceed. May it please the Court, Andrew Adler from the Federal Defender's Association. A trial where the jury must convict and can't acquit is no trial at all. Yet that's the trial that Jack received as a result of the district court's wire fraud instruction in this case. Under this court's decision in Tackle-Off, a scheme to defraud requires a specific intent to harm. But here the instruction required the jury to convict based on his intent to personally gain. Because the evidence on that was undisputed, the jury had no choice but to convict. Meanwhile, the instruction precluded the jury from acquitting, even if it agreed with Jack's Tackle-Off-based defense that he didn't intend to harm the bank. And because the evidence was sufficient for a rational jury to accept that defense, the government cannot meet its burden to prove beyond a reasonable doubt that the instructional error was harmless. The evidence supporting our defense came from the government's own defense examination that the two principals in this case, Jack Cashkar and Mike Vasquez at the bank, reached a mutually beneficial unwritten agreement under which the bank would continue lending money in exchange not for collateral in the form of accounts receivable, but rather in exchange for a simple promise to repay the loan. And so the principals acted accordingly under that bargain. It's undisputed that Jack then flew around the world looking for a third party to refinance the loan, and he found that third party in Libya in Saidi Gaddafi. Counsel, let me ask you a question about this, the jury instruction, the personally gained jury instruction. The defense counsel did not argue below that that court's instruction allowed for a jury to convict if it found that Cashkar intended to personally gain even if he did not intend to harm the bank. And then defense counsel agreed to the court's instruction, including the personal gain language, at the charge conference. The next day before the jury charge, defense counsel made no specific objection to the personal gain language. In fact, the first time he challenged this language was in his reply to the government's response to his motion for a new trial. How is this not invited error? Your Honor, the government has never argued that this was invited error, let alone plain error in this case. And so to the extent there is any forfeiture, the government has forfeited the forfeiture, number one. Number two, we specifically made this argument, as you pointed out, on Docket Entry 564, pages 1 to 3, that's in support of our motion for a new trial. Number three, we specifically objected. This is Docket Entry 616, page 11. And the next morning when the court invented this disjunctive instruction out of nowhere, we came back the next morning and specifically objected to that instruction. And in addition, Docket Entry 492, we had an eight-page pleading devoted specifically to the tackle-off issue and proposing an instruction which did not have any mention of personal gain at all. So I think we've done more than enough to preserve our argument in this case. I mean, this was our entire defense strategy. Tackle-off, we built our entire defense around it and formed our decision to go to trial. And what the judge did at the very end, right when this case was about to go to jury, he took it out of the jury's hands and said, you know what, you cannot accept this defense because he had this intent to personally gain. And so we weren't trying to stand back here. And the district judge, in denying our post-trial motion for a new trial, rejected this on the merits. So, I mean, the judge had an opportunity to do something about it, and he rejected that argument. And the instruction here is clearly incorrect under tackle-off. I mean, in tackle-off itself, the defendants clearly intended to personally gain by luring additional businessmen to the bars. And yet this court reversed their convictions because there was no intent to harm because the misrepresentations in that case didn't affect the nature of the bargain. Is there any other jurisdiction or circuit in the United States where you have to show intent to harm in order to get this kind of conviction? Yes, Your Honor. Tackle-off is based on a line of Second Circuit cases. And that dates back to, I believe, the early 1970s. And so it's well-established in the Second Circuit, and that's what tackle-off was relying on. I haven't read all those cases, but I've read some of them. And it seemed to me that those cases had some differences. I didn't see the specific intent to harm. That seemed to me to be somewhat of a jump that our opinion might have taken beyond what the Second Circuit requires. Well, I think that the Second Circuit was focused on the nature of the bargain, and misrepresentations have to go to that, and that's what this court latched onto in tackle-off. And whether it took a jump or not, that is the law of the mountain in the summer of 2016. This case was indicted in the summer of 16, and we relied on it all the way to inform our decision about what to do in this trial. And in trial, we elicited more than sufficient evidence to show that not only is Jack going around trying to find refinancing for this loan, but Vasquez at the bank is taking all of these unorthodox steps to tell his people, look, lend the money without regard to the formal loan agreements. And so Jack is just going on that. We're following the directives of Vasquez at the bank. And the upshot is that a rational jury could certainly find that misrepresentations about the accounts receivable, the invoices and the aging reports upon which this prosecution was primarily based, that those misrepresentations were extraneous to the bargain that Jack had struck with Mike Vasquez, and therefore did not necessarily reflect an intent to harm the bank. Okay. Let me address that issue. So you're talking about when he's flying around the country looking to try and pay back these loans, that this is happening in the summer of 2006. But the fraud that's being charged, that was charged, began in early 2005. So even if the jury believes that he didn't intend to harm in the summer of 2006, why is this not harmless error? Because it's only the small end part of this scheme. No, Your Honor. There is no allegation of any fraud in 2005. The formal loan agreements were entered into in 2005. But Count 1 begins in May of 2006. And so, and he's That's when the fraudulent customer invoices begin in early 2005. The diversion of the customer payments are beginning, and then the overstated assets, the theft of the loan proceeds. No, Your Honor. There is no allegation in this case that there was any fraud in 2005. There's no allegation that the formal loan agreements, which were entered into March and August of 2005, there's no allegation of fraud there. If you look just at the indictment, Counts 1 through 8 are from May 2006 to June 2007. And Mr. Kachgar begins seeking refinancing right after that August 2006 meeting, where it's understood that basically the formal loan agreements aren't working, both sides aren't complying, Jack's got to go around and find refinancing, and he begins to do just that. And why do we have to assume that his efforts to get refinancing were because of his deep financial arrangements coming to benefit himself? At a certain point, this was going to run out if he couldn't, if he couldn't keep the scheme going, right? Why do we have to assume that he was trying to get that refinancing in order to help the victim company? Well, I think it's just common sense, but I think a rational jury could find that, you know, this, like you said, this could only go on for so long before the bank calls the loan. And so it's in Jack's interest to find a third party to repay this off, and the bank is not harmed. And in fact, he finds that third party in Libya, in Saidi Gaddafi, and the prosecution really didn't want to talk about that deal. They don't even mention it in their initial closing argument, because it's a legitimate deal. And if that deal goes through, there is no harm in this case, there's no prosecution, Jack's not spending the rest of his life in prison. And so it's really a razor-thin margin here between no harm at all, not only no harm, the bank is going to make money, they're going to make 15 to 20 million dollars off of this loan, on the one hand, and on the other hand, what we end up with here. And so I think certainly a rational jury could look at all of those efforts, and just look at the Goldman Sachs deal. That's an eight-month-long relationship between October of 2006 and May 2007. There's extensive due diligence going on, there are customer calls, the refinancing proposal's going on, and you know, you don't spend $300,000 to bring in McKinsey to do, you know, due diligence if you don't actually intend to go through with the refinancing. And I don't think the government disputed in this trial that Jack had a good intent to repay this loan. And I just want to be clear, we're not saying that any time a borrower intends to repay a loan, that that's not fraud. Our defense here turned on the specific bargain that Jack struck with the bank in this case. And so the prosecution's theory was based on the formal loan agreements. And so under those formal loan agreements, sure, misrepresentations about the accounts receivable would intend to harm the bank because that underlied the loan, that the loans were conditioned on those. But here, the bargain between Jack and Mike Vasquez was independent of those formal loan agreements. And we had more than sufficient evidence at this trial to show that. And there- But if an intent to repay a loan demonstrates that you didn't intend to harm the entity that you took the loan out from, why couldn't any person charged with a similar crime simply try to get a deal to repay the loan and evade prosecution? Because it will depend on what the bargain is. So like, for example, in this case, if you have a formal loan agreement where someone is borrowing money in exchange for collateral, and then you lie about the collateral, just intending to repay the loan doesn't immunize you from fraud because your misrepresentations are going to the heart of the bargain that you struck with the bank. Here, the entire defense was premised on the idea that these formal loan agreements had been abandoned. And Mike Vasquez, the decision maker at the bank, is the one abandoning them. And so Jack is saying, okay, well, Mike Vasquez doesn't think that, you know, these loans depend on accounts receivable. So if I sent some invoices to the bank so the bank can document its files so that Mike Vasquez can do what he needs to do and keep sending us the money, well, that's no skin off my back. It's not my job to look out for the best interest of the bank. Meanwhile... Haven't we already held that the negligence of the target, though, isn't a defense to fraud? Right. That's not our defense. We expressly disclaimed that at this trial. We're not saying that he's not guilty because the bank is negligent. We're saying that the bank's actions informed his specific intent and whether his misrepresentations about the invoices and the aging reports reflected an intent to harm the bank. And we're saying that they did not because that wasn't part of the bargain that he struck with the bank's decision maker. So we were never arguing that the bank, that he's not guilty just because the bank was negligent. And we expressly disclaimed that in the trial. Can I ask you this? So the argument that you're making, you're couching it in terms of intent to harm, but it just seems to me that you're really arguing that these were not material misrepresentations because the bank just wasn't relying on them. I mean, wasn't there enough in the jury instructions for you to make that argument? So materiality was one part of our argument, but it was not the main part of our argument. And the problem with the materiality part was that there were people under Mike Vasquez at the bank who were still looking at these invoices because they're still sort of going based off of the formal loan agreements. And so these invoices did have a tendency to influence their decisions. And that's why our main defense at this trial was not so much materiality, but was a lack of intent to harm based on Jack's good faith intentions to repay the money that Mike Vasquez was doing to indicate that misrepresentations about the accounts receivable weren't really an intent to harm the bank because they were on the same page. And so, and I think, I think the crux of our defense. But I guess that's my, I mean, and I understand, I mean, you're saying that was the argument you made, but to me that just doesn't seem to be in this issue of intent. I mean, if you're saying they were on the same page, they knew what was going on. This was the misrepresentations were immaterial because they knew, they didn't care. I mean, why isn't that really where your argument should be? Well, that's not the argument that we were emphasizing in our closing. I mean, I think if you look on pages 67 to 68 of our closing, it's docket entry 549, that really will sort of is the best place where we verbalize this. And to be sure, we mentioned materiality, but that wasn't the focus. And materiality is a separate element in the instruction and  So, I don't think just giving an instruction on materiality would suffice to, to, you know, instruct the jury that they've got to find that he intends to harm the bank here. Not just that these misrepresentations were material. He has to, in his mind, have a specific intent to harm the bank. And we, and all we're saying is that a rational jury could have found that he did not have that intent based on the evidence that we elicited from the government's own witnesses, Jay Green, Sonia Del Valle, to a lesser extent, Rima Goldschmidt. Those three are sufficient for a jury to accept our Tackle-Off based defense. Okay, thank you, Mr. Adler. You've got five minutes left for rebuttal, but Mr. Lieberman. Good morning, your honors. May it please the court, Dave Lieberman for the United States, with me at council tables, Michael Berger, who tried the case below. I'll go straight to the jury instruction issue. First, talking about the merits of Tackle-Off, and then coming back to some of the factual points in the record, which I think go to at least our harmless error argument, if the court gets there. So in Tackle-Off, this court, I want to be very clear about what the intent to harm that we're using. It is an intent, the government must show that the defendant intended to obtain, by deceptive means, something to which he was not entitled to. And the jury instruction here that the court, district court, gave comported with that for two reasons. Reason number one, the court gave a disjunctive formulation, and at least one of the clauses that I think Mr. Adler concedes that tracks Tackle-Off. Reason number two, the personal gain formulation that Mr. Adler has talked about this morning, under the facts of this case, also comported with Tackle-Off. And I'll run through each of those in turn. The district court instructed the jury that if Mr. Cashcard deceived somebody to enter into a transaction, but did not intend to cause a personal gain for himself, or financial loss to the bank, he is not schemed to defraud. So in the government's view, we have two independent pathways. The jury had two independent pathways for acquittal. And the second clause, I think there's no dispute on this, the second clause equates to Tackle-Off, even under the defense's view, because if Cacker intended to cause financial harm to the bank, he has intended to harm the bank. Because the jury would have understood this in ordinary language as a disjunctive instruction, that second clause covers Tackle-Off and forecloses this instructional argument, without even considering the personal gain clause. Couldn't a jury have found that Mr. Tackle-Off didn't intend to harm the bank, but that he did intend to profit himself, and therefore he was guilty? So no, Your Honor, and that goes to my second argument, looking at this personal gain language. Under the facts of this case, if Mr. Cashcard intended to derive personal gain from the bank, when he's making these deceptions about the loan arrangements, he has necessarily intended to obtain property from the bank to which he was not entitled to. And let me drill down on that point. Based on the defendant's misrepresentations, the bank loaned money to the company. The loan agreements specify particular costs, like manufacturing, pharmaceuticals, capital expenses, that the loan money must go towards. There's been never a defense, the defense has never raised an argument that the bank agreed to loan money to Mr. Cacker personally, for houses, for credit card bills, for luxury cars, for private airplanes. If the object of these lies to the bank was for personal gain from the loan agreements, Dr. Cashcard has in Tackle-Off parlance necessarily sought to obtain property, the bank's money, that he was not entitled to under the terms of the loan. And I can give the court a helpful analogy. The court, this court has had over the past 10 years a number of real estate fraud, mortgage fraud cases. And the fact patterns are very similar. A defendant, usually a mortgage broker, goes out and finds a straw buyer to buy a home and go to the bank and say, give me this money. And then the defendant appropriates that money for his personal use. This court has no trouble saying that those types of cases fall under the fraud statute. The fact pattern in this case is materially identical. You know, it's in the commercial loan context. But again, the bank agreed to loan money to the company for specific purposes. And this was in our closing rebuttal to Mr. Adler's, the defense that Mr. Adler has described to this court. Mr. Berger said, this does not explain how $30 million of the bank's money ended up in Dr. Kakar's accounts, credit cards, home purchases. And that is why, in this case, personal gain and loss to the bank are two sides of the same coin. Now there may be, in my experience, very rare instances, like the hypotheticals discussed in Kakar, where you could have personal gain without any accompanying loss to the victim. But in light of the fact that so much of this loan money ended up in Dr. Kakar's pockets, the jury had an ample basis to conclude that if the object was personal gain from those loan deceptions, then necessarily it was at the expense of the bank. And that is- Could it be that it was that he did not care if the bank was harmed, which would be more like a recklessness standard, as opposed to he intended that the bank was harmed? So I don't think so, Your Honor. It's certainly that- I don't think that was- that type of a defense was made below or is available under the facts of this case, given the just massive amount of both the money that Dr. Kakar took from the loan agreements, and that the fact that he is giving- not just about the quality of the invoices, which served as the claddle for the loan, but his personal guarantees that he was providing to back up that particular loan. So even if there is some potential wiggle room here, and I'm not sure that there is, it was harmless on this recklessness point under the facts of this case. And I would like to pivot there- Let me ask you one question just on this jury instruction and the personal gain issue. I note that the court also instructed to find the term scheme to defraud, and in that definition did not use personal gain. The term scheme to defraud includes any plan or course of action intended to deceive or cheat someone out of property or money by using false or fraudulent pretenses, representations, or promises. And so does that correct any problem with the personal gain reference that had occurred before that? So I don't think there's any- the government is not- thinks there's no problem with the personal gain. Assuming we were to decide that was a problem, does that serve to correct anything? Yes, I think that would actually address Judge Grant's question that combining that language, this was not a case where the jury would somehow have rested its verdict on recklessness. Unless there are any more questions on the merits of the Tackle Off argument, I'd like to just respond to a couple points on the record, and this goes to the government's harmless error arguments. Even if there's any instructional error in this case, it was harmless, and it was harmless primarily for the reasons that I mentioned before. Even if Dr. Kashgar got his preferred language, it still does not explain how he ended up with 30 million dollars of the money that the bank agreed to loan his company, how that money ended up in his accounts and to buy his homes, his luxuries. In addition, Mr. Adler has talked about the defense being that he generally thought he wanted to repay the bank, and the bank had given them this unwritten oral agreement to jettison the collateral requirements of the loan. Now, the first renegotiations for refinancing start in September 2006, and that's the Credit Suisse deal. The first invoice, the false invoice that we produced at trial, I have in my notes, it was dated May 2006. So the false invoices, and this is a question I think Judge Branch, you asked, the scheme to defraud predates, to my recollection, that first refinancing deal in September 2006. And we had five witnesses testify that Dr. Kashgar had instructed them to create these false invoices, which were then supplied to the bank. Why is he doing that if he had this unwritten deal with the bank where the collateral didn't matter? And we have, there are another, a number of other examples in the record where there's a mismatch between Dr. Kashgar's own actions or the actions of others, and this asserted defense. The bank, Mr. Vasquez, in October of 2006 says, additional loan funding will be contingent on you, Dr. Kashgar, providing additional collateral. That's an email that's in the record. Why would he send that email if he had agreed to renounce the loan collateral requirements? Third point, Dr. Kashgar directed Ms. Goldschmidt, the bank, to forego sending credit notes to the bank. These were notes that corrected the fake invoices that the customers never received and never paid. And these credit notes corrected those in the bank's internal records. If the bank had renounced the collateral requirements, Dr. Kashgar wouldn't have had any concern about sending those notes to the bank and informing them, hey, we know we previously said we had X amount of invoices. We actually had a much lower amount. Finally, David Zinn, he was one of the finance people who testified at trial, found a huge invoicing discrepancy. The company had told the bank an $80 million discrepancy. The company had told the bank, we have $80 million more in sales than we actually had. He emails Mr. Vasquez and says, I've discovered this huge discrepancy. Dr. Kashgar immediately emails Mr. Zinn and says, stop communications, or these are, Packer sends a strictly confidential email directing Mr. Zinn to cease communications with the bank because they're in negotiations. If the bank, according to Dr. Kashgar, had renounced the collateral requirements, then there would have been no concern. Why would Dr. Kashgar send an email to his subordinate and say, don't tell them about the collateral if the bank had said, we don't care about the collateral? So, line up all of these explanations, including Dr. Kashgar's own words and actions, and combine that with the some $30 million that he pocketed from a loan, not to him, but his company. And the jury in this case would have convicted, even if it had obtained the defense preferred language in the instruction. I'm happy to answer any more questions about this instructional claim. Dr. Kashgar has raised also a number of other claims, two with respect to his trial and a number of sentencing and restitution claims. I'm happy to rest on their briefs unless the court has any questions or concerns they would like, you would like me to address. Were the emails that he wanted to enter really hearsay? Weren't those entered to show the effect of the communications on Hunter rather than the existence of a deal? The defense sought to emit them substantively under 8036 as substantive evidence. The defense was freely permitted in the cross-examination of Mr. Hunter to use the contents of those emails in an effort to show that Mr. Hunter was potentially biased or had a motive to lie. And so the cross-examination is at docket entry 539, starting at page 126 through 151. And so the issue presented here is, are these business records under 8036? The district court said that they were not. There's no abuse of discretion given the record before the court that this was not the type of activity that the bank regularly conducted. And the defense was given an opportunity to cross-examine, your honor, Mr. Hunter, for those non-hearsay purposes. And in any event, any error in excluding those settlement emails was harmless. The government corroborated the key aspects of Mr. Hunter's testimony, namely four other witnesses connected Dr. Kashgar to the fraudulent invoicing scheme. Mr. Hunter was also the chief science officer. If I recall, he was located in the United Kingdom. He didn't negotiate the loan. He had no dealings with the bank. He wasn't transmitting the invoices to the bank. And just as importantly, the IRS audit showed that the $30 million ended up in Dr. Kashgar's accounts, not Mr. Hunter's accounts. So any suggestion that the defense would have impeached Mr. Hunter, shown that maybe he was the impetus for this giant scheme, I don't think it carries weight given the strength of the record. I've actually got one follow-up on the jury instruction issue. Yes, your honor. Your brief seems to exclusively address the legal correctness. And now here you've told us some but on what grounds could the district court exercise its discretion to reject the change requested by Mr. Kashgar? So I think the district court just didn't think that it encompassed the intent to harm, at least the intent to obtain property by deceptive means. I don't think the personal gain language, it's not in this court's model instruction. So to the extent that the district court rejected that aspect, maybe that was error, but it was harmless for all the reasons that I said because the instruction as given correctly toed to the tackle-off line. And so we don't see any legal error in the defense proposed instruction, but that doesn't mean that the instruction that the court gave also is legally erroneous. Correct me if I'm wrong, but didn't we change our model instructions after your case was completed? I think so, your honor. I'd have to go back and check the dates. It's been a while since I looked at the model instruction. Isn't your harmless error argument though, I mean, wouldn't everything that you said, I guess the better way to ask this question is what have you said about harmless error in this case that could not have been said in the tackle-off case? So in tackle-off, the victim, the panel said the victim got what the victim bargained for, which was to have a drink with the woman at the bar. In this case, the bank entered a loan agreement to give money to the company for specific purposes by repayment, with repayment from the company. And you had Dr. Kashkar divert that money to his own personal luxuries. So the bank agreed to loan money for X purpose. Dr. Kashkar converted that commercial loan into a personal loan. And by doing that, he obtained property to which he was not entitled to under the bargain that the company struck with the bank. Okay. I mean, that argument seems, that's a good, I understand that point, but that seems inconsistent with the government's theory at trial, which was that he made these misrepresentations about collateral to get the money in the first place, that that was, that was the misrepresentation. That was the problem. There were a number of misrepresentations here. It was, there were, at the start of this, it was the misrepresentation, under the loan, I'm over time, may I finish your question? Yes, please. Under the loan agreement, the company could only get money from the bank if it put up the collateral. And so that's when we start the first set of misrepresentations about the fake invoices, which serve as collateral for the loan. The more invoices that go to the bank, the more that the bank will then provide loan advancements. Those, that scheme to defraud then transmogrifies into further misrepresentations about personal collateral that Dr. Kashgar has posted to keep getting those, for the company to keep getting those loan advancements, as well as misrepresentations to the bank about his efforts to obtain refinancing. So the fraud here was not just to get the loan, it was to keep the money flowing in under the terms of the loan agreement. All right. Thank you, Your Honor. We ask that the court affirm. Thank you, Mr. Lieberman. Mr. Adler, you have five minutes. Thank you, Your Honor. So I'd like to make several points if I can. On the merits of the instruction, I'm not quite sure why the court is giving a disjunctive instruction if intent to personally gain and harm are the same thing. And indeed, the district court at the charge conference appeared to intend the exact invalid theory of liability that we were saying existed based on personal gain alone. Now, the government is really sort of making a harmless error argument to say, well, personal gain and harm to the bank are one and the same thing because he's taking, because he's getting the money. He got $30 million. That's what the government is standing up here and emphasizing. But I think a rational jury could find that Mike Vasquez, the decision was allocated once it got to INIX. All he cared about is that he's getting the money back in the end, and he's not harmed. He's making money off of this. And so maybe the board of directors at INIX has a bone to pick with Jack about how the money was being allocated or his compensation, but that's neither here nor there. As to Judge Branch's question about the pattern, that pattern was amended the day after the jury was instructed in this case. The pattern came out for February 1st, 2019, and that's why we really amplified our argument in the post-trial motion because the pattern had come out incorporating tackle-off. And in that new pattern, it expressly adopts the specific intent to cause financial injury or loss language that we're relying on, and it says nothing, nothing at all about personal gain. There's not a mention of that in the post-tackle-off pattern. In addition, you asked about the scheme to defraud instruction. That existed as well before tackle-off, and it did not stop this court in tackle-off from reversing the conviction. And the problem with that instruction is that it just talks about intent to deceive, and tackle-off made clear that deception is not enough. As to the timeline here, the government said something about how well the payoff negotiations started after count one. So really, this only goes to count one here, which was in May 2006, but Jay Green testified that the bank and INIX were basically not complying with these formal loan agreements from the very beginning. That's why we see there's a written waiver of certain violations of the loan agreement as early as March of 2006. That's defense exhibit six. And we also see Sonia Del Valle testifying on cross-examination about Mike Vasquez is accepting developmental invoices, which he's not allowed to accept under the formal loan agreements as early as April of 2006. So that's just on that timeline. The government referring to, I think, I believe he's talking about defense government exhibit 2-18, which is an email that Mike Vasquez writes saying we can't accept unsecured loans, and the government is asking why would Mike send that? Well, in the business, that's what we call a CYA email, because he is taking all sorts of actions that are contrary to that email. And just two months later, defense exhibit 69 is an email written by one of Mike Vasquez's employees, Julia Fuentes at the bank, and says per Mike Vasquez's verbal instructions, he didn't want any of this in writing, per his verbal instructions, do not post any of the ineligible collateral information into our internal software system, the Stucky system, because there's a payoff ongoing. So that's further evidence of the deal that Mike struck with Jack. Now, the government talked about David Zinn and the shortfall that he discovered, and Mike being surprised at the shortfall. Well, I mean, a rational jury could find that Mike was actually just reacting to realizing that his gambit wasn't panning out, and he was in deep trouble at that point in June. But how surprised could Mike Vasquez be when the very next day, June 5th, after there's a meeting in Miami with David Zinn, June 6th, the next day, the bank sends $613,000 to INEX. So how surprised could Mike Vasquez really be here? If he really didn't know what was going on, he gets on the phone, he says, don't lend them another cent until we figure this out. Oh, last point, Your Honor. Why is Jack Hatchcar going to the trouble of sending all of these invoices if they're all on the same page? Well, because there's underlings at the bank that are still operating under the formal loan agreement. So, you know, basically, these invoices and these invoices document the record, cover themselves. So Mike Vasquez is going out on a limb here. He's not really supposed to be flouting these formal loan agreements, but he's doing it. He's the decision-maker at the bank. He's the president of the business credit division. And Jack Hatchcar is following Mike Vasquez's lead. But his people at the bank don't really know what's going on. Sonia Devay is just a poor clerk, and she's just trying to do her job. And so Jack's saying, okay, if I have to send some invoices to help the bank cover themselves, that's fine. And Rima Goldschmidt on cross-examination testified about that, that the bankers were just saying, just send me what you have. And this is docket entry 543, pages 97 to 99. That's her testimony on cross-examination, another one of the government's own witnesses. In your view, is Vasquez the victim that needs to be harmed, or is the bank, right? If employees of the bank are concerned about what's going on, why hasn't the government shown intent to harm the bank? Because the question is, because Vasquez is the bank. He is the decision-maker. He is the president. He has the million dollars a year, and he is the one that Jack is dealing with. Jack doesn't know what Mike Vasquez is doing with his employees. So Jack's intent to harm is based on his interactions with the bank's decision-maker, not what the lowly clerks at the bank are doing. If there are no further questions, we respectfully urge that the court vacate the wire fraud convictions in this case and remand for a new trial, one where the government, one where the jury does not have to convict but can actually accept the tackle-up argument that we built our entire defense strategy around. Thank the court very much for its time. Thank you, Mr. Adler. Thank you both. We have your case under submission.